FILED
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

2001 AUG 21  A 9: 14

CLERK'S OFF...
AT BALTIMORE

RHONDA D. COLLIER,
    Plaintiff

    v.

RAM PARTNERS, INC.,
    Defendant

:
:
:
:
:
:
:
:
:

Civil No. AMD 00-3294

...oOo...

## MEMORANDUM

The plaintiff, Rhonda D. Collier ("Collier"), an African-American female, instituted this employment discrimination action against her former employer, RAM Partners, Inc. ("RAM"), alleging hostile work environment on the basis of race under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and state law claims of intentional infliction of emotional distress and "breach of the employer's duty not to imperil the employee." Collier seeks equitable relief and damages.

Now pending are the parties' cross-motions for summary judgment. I have given careful attention to the parties' memoranda and exhibits, and a hearing is not needed. Local Rule 105.6. According to Collier, RAM permitted Collier's co-worker, Timothy Moody, to create a workplace environment which was permeated with racist disparagement, put-downs and demeaning stereotypes. Given the coarseness of modern discourse, racist speech, however repugnant to people of good will in a culturally diverse society, might only rarely give rise to a cognizable claim of hostile environment employment discrimination. The record here demonstrates, however, when viewed in the light most favorable to Collier, that



this is one of those relatively rare cases. In any event, moreover, when Collier protested the

verbally-created racist regime, which she contends was tolerated by company officials, she

was subjected to serious threats of physical harm. Thus, for the reasons explained below, I

shall deny the defendant's motion for summary judgment as to the federal employment

discrimination claim and grant the motion as to the state law claims. Collier's motion for

summary judgment shall be denied.

I

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits,

if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247 (1986). A fact is material for purposes of summary judgment, if when applied to the

substantive law, it affects the outcome of the litigation. *Id.* at 248.  Summary judgment is

also appropriate when a party "fails to make a showing sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden of

proof at trial." *Celotex Corp. v. Catrett*, 477 U.S.  317, 322 (1986).

A party opposing a properly supported motion for summary judgment bears the

burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S.

at 248-49.  "When a motion for summary judgment is made and supported as provided in

[Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse

party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). *See Celotex Corp.*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252; *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir. 1991). Of course, the facts, as well as the justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

When both parties file motions for summary judgment, as here, the court applies the same standards of review. *Taft Broadcasting Co. v. United States,* 929 F.2d 240, 248 (6th Cir. 1991)*; ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to resolve genuine issues of material facts on a motion for summary judgment-- even where . . . both parties have filed cross motions for summary judgment")(emphasis omitted), *cert. denied*, 469 U.S. 1215 (1985).

The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. and Indem. Co.*, 627 F. Supp. 170, 172 (D. Md. 1985)(*quoting* Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2720 (2d ed. 1993)). *See also Federal Sav. and Loan Ins. Corp. v. Heidrick*, 774 F.

Supp. 352, 356 (D. Md. 1991). "[C]ross-motions for summary judgment do not automatically empower the court to dispense with the determination whether questions of material fact exist." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir.), *cert. denied*, 464 U.S. 805 (1983). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987). Both motions may be denied. *See Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983).

"[B]y the filing of a motion [for summary judgment] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Nafco Oil and Gas, Inc. v. Appleman*, 380 F.2d 323, 325 (10th Cir. 1967). *See also McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982) ("neither party waives the right to a full trial on the merits by filing its own motion"). However, when cross-motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they "may be probative of the non-existence of a factual dispute." *Shook*, 713 F.2d at 665.

## II

As a part of her submission on the summary judgment motions, Collier has included her own affidavit and the affidavits of several witnesses. RAM raises several objections to three of these affidavits. I will first address these evidentiary matters.

First, RAM objects to Collier's affidavit, which details a luncheon attended by co-workers. Collier's affidavit avers that after the luncheon she telephoned Dean Sigmon ("Sigmon"), RAM's Area Vice President, and complained about a racial slur used by Collier's co-worker, Timothy Moody. RAM contends that Collier's affidavit contradicts her deposition testimony because she failed to mention this incident and the subsequent telephone conversation with Sigmon. Thus, RAM relies on the long-settled rule that an affidavit may be disregarded if the averments contained therein are inconsistent with previous deposition testimony. *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 976 (4th Cir. 1990); *Barwick v. Celotex Corp.,* 736 F.2d 946 (4th Cir.1984). As the Fourth Circuit has cautioned, however, "for the rule of *Rohrbough* to apply, there must exist a bona fide inconsistency." *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 186 n.7 (4th Cir. 2001).

I reject RAM's characterization of Collier's affidavit as inconsistent with her deposition testimony; it is not. Collier indicated on deposition that Moody's threats (discussed *infra*) were caused by an earlier complaint to Sigmon. Moreover, Collier's affidavit testimony is corroborated by the affidavit submitted by Shirley Harvey, Collier's mother, who recalls that her daughter was upset after the luncheon and that she advised her daughter to telephone Sigmon. Therefore, I shall deny the defendant's request to exclude Collier's affidavit and I will consider its contents for the purposes of summary judgment.[1]

---

[1]RAM also argues that Collier's affidavit contradicts her deposition testimony because when she was asked on deposition when she first told Sigmon about the racial remarks, she did

(continued...)

-5-

Next, RAM objects to Nakia Long's affidavit. Long is a former manager of RAM. Plaintiff's counsel failed to obtain the prior consent of RAM or its counsel before speaking with Long and obtaining her affidavit, and thereby, according to RAM, violated Maryland Rule of Professional Conduct 4.2, as interpreted in my opinion in *Zachair, Ltd. v. Driggs*, 965 F.Supp. 741 (D.Md. 1997), *aff'd on other grounds*, 141 F.3d 1162 (4th Cir. 1998) (table). I reject this ground as a basis for refusing to consider the information obtained by counsel for Collier from Long. *Ex parte* contact with former employees of a party is prohibited only under circumstances in which the former employee has been "*extensively exposed*" to confidential information and there exists a risk that confidential information protected by the former employer's attorney-client privilege might be disclosed without an opportunity for the former employer to claim the protection of the privilege. *See Zachair*, 965

---

[1](...continued)

not respond by referencing the telephone conversation detailed in the affidavit. The following dialogue, however, inquiring as to the first time Collier told Sigmon about the racial remarks, is unclear and vague:

> Q.   Now, when you talked to [Sigmon] on that day, Monday, and you called him, did you tell [Sigmon] that you were complaining about the racial remarks that Moody had made or did you –
> A.   That morning?
> Q.   Yes.
> A.   He made – he didn't make the racial remark that morning.
> Q.   That morning was more – what–
> A.   The bodily threats.
> Q .   Okay. Well, when was the first time that you told Dean about the racial remarks, when you gave him the letters?
> A.   No, when he came to the house.

Collier Dep. at 183.

F.Supp. at 752 (internal citations omitted) (emphasis in original). Here, none of the assertions in the Long affidavit are covered by RAM's attorney-client privilege. Nor does RAM argue that Long had been exposed during her employment to confidential information protected by the attorney-client privilege. Accordingly, RAM has not demonstrated that counsel for Collier engaged in improper *ex parte* contact with Long within the rule of *Zachair*.

RAM also objects to the Long affidavit because it is unsworn. "[U]nsworn statements do not qualify as affidavits and are not considered by the Court for purposes of summary judgment." *Solis v. Prince George's County*,--- F.Supp.2d ----, ---- (D.Md. 2001), 2001 WL 804568 *2 (D.Md. July 13, 2001)(citing *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir.1993)). The Long affidavit was intended to be sworn to before a notary, as were the other affidavits submitted by Collier. Although there is no requirement that a Rule 56 affidavit or declaration be notarized, *see* 28 U.S.C. § 1746, the Long affidavit was neither sworn before a notary nor executed "under penalty of perjury." *See id.* Therefore, RAM's challenge to the Long affidavit is well-taken. Consequently, I will exclude the Long affidavit for purposes of summary judgment.

Finally, RAM objects to the affidavit of Monique Murray, the official investigator who investigated Collier's charge of discrimination. RAM objects to the affidavit because Murray was not listed as a potential witness in plaintiff's discovery responses. Although I do not condone Collier's failure to identify Murray in her earlier discovery responses, because RAM has failed to show any prejudice, I will not exclude the affidavit. I shall,

-7-

however, permit RAM to take Murray's deposition, at Collier's cost, if it is anticipated that Murray will testify at trial. (RAM also objects to my consideration of Murray's notes. Murray fully authenticates the notes, however, and they are admissible as public records. Fed. R. Evid. 803(8)). Therefore, I will consider Murray's affidavit (and her accompanying notes) for the purposes of summary judgment.

### III

I shall turn now to the merits of the cross-motions for summary judgment. I view the facts. of course, in the light most favorable to the respective non-movant.

Collier began working as a leasing agent on June 9, 1998, at the Laurel Crossing Apartment Complex ("the Property" or "the Site"). At the commencement of Collier's employment, H.G. Smithy Company managed the Property. In August 1999, approximately one year after Collier began her employment at the Property, RAM became the Property Manager, replacing H.G. Smithy Company. RAM managed the Property during the period when Collier's claims accrued. During that entire period, all of RAM's employees at the Property were Caucasian with the exception of Collier.

As a leasing agent. Collier's responsibilities included showing the apartments to prospective tenants, corresponding with tenants, inspecting the rental units, processing rental applications and preparing the rental documents. Cordell Dep. at 16, 17. Beginning in August 1998, Collier lived in an apartment on the Property, as did other RAM employees, including Keith Feld, the maintenance supervisor, and Moody, the maintenance technician.

Both before and after RAM assumed the management of the Property, Collier received praise regarding her performance. In August 1999, Collier was nominated for leasing consultant of the month; in October 1999, RAM praised Collier for increasing occupancy from 91% to 97% in just three months. Collier's supervisor noted that she was a responsible, respectful and trustworthy employee. Cordell Dep. at 17.

At all times relevant to this case, RAM alleges, it had in place a policy prohibiting harassment. Shortly after RAM assumed management of the Property, RAM held an offsite orientation presided over by Sigmon and other managers from RAM. Collier Dep. at 71-75. During this orientation, a RAM manager referred to RAM's procedure for complaining about sexual harassment, and that if it occurred, the RAM employee should notify his/her immediate supervisor. Collier Dep. at 77-78. Collier did not receive a written copy of this policy, however, until January 2000. Collier Dep. at 76.

The RAM Anti-Harassment Policy states the following: (1) all employees have a right to work in an environment free from discrimination, including harassment; (2) RAM will not tolerate any form of harassment, including harassment on the basis of race; and (3) any violation of the Policy would subject the violator to disciplinary action, up to and including immediate termination. Under the policy, harassment includes, but is not limited to, repeated slurs, insults, insensitive remarks and jokes, or other personal conduct or mannerisms that could be construed as offensive, derogatory or inappropriate. The policy states that any employee who is the victim of harassment, or who becomes aware that someone else is being

-9-

harassed, is responsible for immediately reporting the harassment to either the employee's immediate supervisor, a representative of the human resources department, or any member of senior management. In the event a complaint is lodged under the policy, RAM is to conduct a timely and impartial investigation, and if harassment occurred, appropriate action taken.

According to Collier, her troubles began in October 1999. Collier Dep. at 141. It was at this time that Moody, the maintenance technician at the Property, began using highly offensive language on a frequent basis. *Id.;* Sigmon Dep. at 70. The majority of these comments were made in Collier's presence as she worked in the leasing office. Moody's conduct included frequent use -- about two or three times per week-- of the epithet "nigger." Collier Dep. at 333. Collier also recalled that Moody referred to African-Americans as "gorillas." Collier Dep. at 330. In fact, Moody also used racial slurs in the presence of Collier to describe members of any non-Caucasian group. He rarely hesitated to refer to Chinese persons as "gooks," "slant eyes" or "chinks;" and to Latinos and Hispanics as "wetbacks" or "spics." Collier Dep. at 331.

Collier testified on deposition that Moody freely made racist remarks in the presence of supervisors, in including Diane Cordell, the resident manager (and Collier's immediate supervisor), and Feld, the maintenance supervisor (and Moody's immediate supervisor). Collier Dep. at 331. Collier recalled one specific occasion during which Moody and Feld engaged in a conversation in which they repeatedly used the epithet "nigger."

Although Collier is unable to provide specific dates, she recalls a handful of incidents in which she complained either to Cordell or Feld about the offensive comments Moody frequently made in her presence. One of the earliest times that Collier recalls notifying Cordell about Moody's references was in October 1999. According to Collier, she spoke to Cordell after Moody referred to an African-American male resident as a "milk dud."[2] Collier Dep. at 143. Collier reiterated her discomfort with Moody's behavior when Moody referred to a resident as a "wetback" and stated that the resident should not be allowed to live in the United States if she could not speak English. Moody made this remark in the presence of both Collier and Cordell. Collier Dep. at 142. After Moody left the office, Collier said to Cordell, "Do you see what I mean?." referring to her earlier conversation with Cordell in which she discussed Moody's use of racist speech. Collier Dep. at 145.

Around the second week of December 1999, Collier was subjected to more derogatory comments. This specific incident included not only Moody, but also his supervisor, Feld. While in the leasing office, Moody and Feld had a conversation, during which Feld stated that "he knew this nigger that had a bunch of kids and she wasn't out of high school yet." Collier Dep. at 156-57. Collier recalled that when she looked up, both Moody and Feld were smiling and Moody asked "how many babies did the nigger have?" *Id.* Upon hearing this, Collier again informed Cordell that racial comments were being made in the office, hoping

---

[2]Milk Duds are chocolate covered caramels, a candy produced by Hershey Foods Corporation. *See* http://www.hersheys.com/products/other/milk_duds.html (visited on August 16, 2001).

action would be taken. *Id.* at 157-58. However, the offensive comments did not cease.

A short while thereafter, Moody walked into the leasing office and stated that he had "just came back from seeking [sic] his nigger." Collier Dep. at 159. When Collier asked Moody why he made these comments, he stated "because he could." *Id.* at 160. Later that day, Collier informed Feld about Moody's comment. Feld responded by joking about the incident. Collier Dep. at 162. Feld eventually apologized to Collier and told her that he would speak with Moody. *Id.* at 163.

On or about December 17, 1999, Collier attended a holiday luncheon with co-workers at a local restaurant. Moody again used the term "nigger" at this luncheon. As a result, Collier telephoned Sigmon, the Area Vice President, and informed him of Moody's comment. Aff. Collier at ¶ 5. Sigmon dismissed Collier's concern, stating that she took "[the] comment the wrong way and that [Moody] did not mean it that way." Aff. Collier at ¶ 6.

Also on December 17, 1999, Collier informed Cordell about a comment that she believed Moody had made to Sigmon. Collier stated that Feld and his wife approached Collier and repeated a comment that they overheard Moody say to Sigmon. Apparently, Moody asked Sigmon whether the door prizes at the Christmas party had been "nigger rigged." Collier Dep. at 149. Collier testified that she immediately informed Cordell, who responded by smiling. *Id.*

According to Collier, after she complained to Sigmon, Moody physically confronted her. Specifically, Moody demanded to know what Collier had said to Sigmon. Collier Dep.

at 166-69. Collier testified that she responded by asking Moody whether he was above the law. He stated: "The law was meant to be broken, like your nose." *Id.* Later that day, Moody returned to the office and told Collier that if she had a problem with him, she was to go to him not Sigmon. *Id.* at 166. Moody returned to the office later that evening and again threatened Collier.

On or about December 21, 1999, Collier attended a meeting with Sigmon and Moody in an attempt resolve the dispute. Because she feared for her safety, Collier called the police and they accompanied her to the meeting. When Collier stated that she could no longer work with Moody, Sigmon offered to have Collier transferred to another apartment community managed by RAM. Collier Dep. at 180. Collier stated RAM should transfer Moody, not her. *Id.* Later that day, Collier specifically informed Sigmon about Moody's racial epithets which he had made over the course of her employment with RAM. *Id.*

Sigmon testified on deposition that he confirmed Moody's behavior, as reported by Collier, by conducting a short investigation. Sigmon Dep. at 60-61. Indeed, other co-workers and persons in supervisory positions had overheard Moody's use of racial epithets. Specifically, Earnest Graves, the groundsman/porter, confirmed that Moody made offensive remarks which may have included use of the term "nigger" and "black sons of bitches." Sigmon Dep. at 64, 68; McCallum Dep. at 15-16, 34. Sigmon testified that these comments violated RAM's Anti-Harassment Policy and that Graves should have reported this conduct. However, Sigmon also testified that Graves was never disciplined for failing to report

-13-

Moody's conduct. Sigmon Dep. at 66.

Upon further investigation, Sigmon learned from Cordell that she had heard Moody use the epithet "nigger" and he confirmed that Moody had used the term in the presence of Collier. Sigmon Dep. at 70-72. Cordell informed Sigmon that she did not report the conduct because Moody used the language in a "sarcastic" or "joking way." Sigmon Dep. at 72-73. Cordell testified that she equated these racial slurs with comments made by Collier about a resident having a "big mouth." Cordell Dep. at 43. Sigmon stated on deposition that Cordell should have reported the conduct to him, but nonetheless, he did not discipline Cordell for her failure. Sigmon Dep. at 73.

Likewise, Feld, the maintenance supervisor (and Moody's supervisor), confirmed Moody's conduct, specifically his use of the term "nigger." Sigmon Dep. at 80. Sigmon testified that Feld had violated RAM's Anti-Harassment policy by failing to report Moody's conduct. Sigmon Dep. at 81. Sigmon also testified that he did not discipline Feld. *Id.*

On or about December 27, 1999, Feld informed Collier that Moody would do her bodily harm if he lost his job. Feld also told her to "watch her back" because "Moody might start shooting up the office." Collier at 188-89. Collier again informed Sigmon about her concern for her safety. *Id.* On or about that same date, Sigmon terminated Moody and gave him seven days to vacate his apartment at the Property. Sigmon Dep. at 126, 128-29, 159. Sigmon also testified that he "may" have suspended Moody, but Sigmon could not recall the date of the suspension or whether the suspension occurred before or after the incident on

-14-

December 27, 1999. This alleged suspension, if any, was never documented in writing. Sigmon Dep. at 166-67.

After Moody physically threatened Collier, she took a leave of absence. She returned to work on or about January 18, 2000. Shortly thereafter, Collier left on another leave of absence after being confronted and threatened by Feld, allegedly in retaliation for allegations she had made in her formal complaint to the EEOC. Feld resigned that same day. On February 23, 2000, Collier applied for short-term disability benefits. Collier Dep. at 246-48. On February 29, 2000, Collier received a letter from Sigmon advising her that the Property had been sold as of that date and that the new owner had not retained RAM to manage the property. Thus, Collier, along with all other employees at the Property, had been terminated.

Collier alleges that as a result of the hostile work environment created by Moody, she has suffered severe emotional distress. Specifically, as a result of the environment at work, she sought psychiatric treatment and was placed on disability. Collier alleges that she suffered from depression, anxiety, inability to sleep, weight gain of 40 pounds and fear of leaving her home. Collier also alleges that she was placed on several medications including Prozac, Buspar, Risperdal and Paxil to help alleviate these symptoms. Collier discontinued active treatment for her condition at the end of the year 2000 because she lacked insurance. Collier Dep. at 348. Collier alleges that these mental health problems continue to affect her.

IV

A

The Supreme Court, in *Meritor Svgs. Bank v. Vinson,* 477 U.S. 57, 65 (1986),

recognized that "Title VII affords employees the right to work in an environment free from

discriminatory intimidation, ridicule, and insult." *See also Harris v. Forklift Systems, Inc.,*

510 U.S. 17 (1993). To be actionable under Title VII, however, the conduct cannot merely

generate "offensive feelings in a employee." *Faragher v. City of Boca Raton.* 524 U.S. 775,

787 (1998) *(citing Harris).* Nor does Title VII prohibit "genuine but innocuous differences"

in the ways that persons interact with each other in the workplace. *Oncale v. Sundowner*

*Offshore Services, Inc.,* 523 U.S. 75, 81 (1998). Rather, the objectionable conduct must be

such as to create a work environment that is "both objectively and subjectively offensive, one

that a reasonable person would find hostile or abusive, and one that the victim in fact did

perceive to be so." *Faragher*, 524 U.S. at 787 *(citing Harris)*. *See also Spriggs v. Diamond*

*Auto Glass,* 242 F.3d 179, 184 (4th Cir. 2001) (citations omitted). Although there is no

precise test for determining whether a work environment is sufficiently hostile to be

actionable under Title VII, the Supreme Court in *Harris* outlined the following factors for

consideration in making the determination:

> [W]hether an environment is "hostile" or "abusive" can be determined only by
> looking at all the circumstances. These may include the frequency of the
> discriminatory conduct; its severity; whether it is physically threatening or
> humiliating, or a mere offensive utterance; and whether it unreasonably
> interferes with an employee's work performance. The effect on the employee's

> psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Id.* at 371.

In *Causey v. Balog*, 162 F.3d 795 (1998), the Fourth Circuit described the following elements which the plaintiff must demonstrate to establish a *prima facie* case for a hostile work environment claim:

> The plaintiff must show that (1) the harassment was unwelcome; (2) that the harassment was based on [race]; (3) that the harassment was sufficiently pervasive or severe to alter the conditions of employment and create an abusive atmosphere; and (4) that some basis exists for imposing liability on the employer.

*Id.* at 801 (citation omitted); *see Spriggs*, 242 F.3d at 183-84.[3]

B

In this case, Collier's claims arise from the acts of a co-employee-- Moody-- and not from "supervisory harassment." Moreover, she has not suffered a "tangible employment action."[4] Accordingly, RAM may not be found liable for harassment on agency principles; rather, it may be found liable "only for [its] own negligence in failing, after actual or

---

[3]As noted in *Spriggs*, although *Burlington Industries, Inc., v. Ellerth*, 524 U.S. 742 (1998), and *Faragher* each specifically dealt with sexual harassment claims, there is a consensus that their holdings also apply to other types of harassment claims brought under Title VII. *Spriggs*, 242 F.3d at 186 n. 9.

[4]"A 'tangible employment action' occurs whenever 'a significant change in employment status' is effected, 'such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.' *Ellerth*, 524 U.S. at 761." *Spriggs*, 242 F.3d at 186 n.8.

constructive knowledge [of the harassment], to take prompt and adequate action to stop it."

*Mikels v. City of Durham, N.C.*, 183 F.3d 323, 332 (4thCir. 1999); *see also Jaudon v. Elder Health, Inc.*, 125 F.Supp.2d 153, 161 (D.Md. 2000).

C

RAM challenges Collier's showing on numerous grounds. It contends that Collier has failed to establish a *prima facie* case because she has failed to demonstrate that Moody's alleged conduct created a hostile environment. Def.'s Mem. in Supp. of Mot. for Summ. J. and Opp. to Pl.'s Mem. in Supp. of Mot. for Summ. J. at 23. In particular, RAM argues that Collier cannot demonstrate a hostile work environment because there is no evidence or testimony that in the events recalled by Collier, any of the inappropriate comments Moody made were *directed to* Collier. Def.'s Mem. in Supp. of Mot. for Summ. J. and Opp. to Pl.'s Mem. in Supp. of Mot. for Summ. J. at 23. RAM also contends that the comments were not due to Collier's race and that the events described by Collier were too isolated and sporadic to create a hostile work environment. *Id* at 21, 23. RAM also suggests that Collier has failed to demonstrate that the comments were unwelcome. *Id.* at 22. These contentions are unavailing.

First, it is clear that a reasonable person could readily find that the incessant use of racial invective in Collier's work place was such that she, as a reasonable African-American, was subjected to "discriminatory intimidation, ridicule, and insult." *See Meritor Savings Bank*, 477 U.S. at 65. RAM's argument that racial slurs, insults and epithets targeted at

-18-

individuals other than Collier cannot be considered actionable as to Collier is contrary to law. In *Spriggs*, a case in which a *white man* made racially derogatory comments about, *inter alia*, his *African-American wife*, in the presence of the plaintiff, who was also African-American, 242 F.3d at 182, the Fourth Circuit rejected the very argument made here by RAM. *Id*. at 184. The Court reasoned that in a hostile work environment claim, the central inquiry is whether a hostile environment was created, stating: "We are, after all, concerned with the 'environment' of workplace hostility, and whatever the contours of one's environment they surely may exceed the individual dynamic between the complainant and his supervisor." *Id*.[5] Plainly, the issue of whether epithets are directed at the plaintiff is not determinative, especially where the offensive language was often used in the plaintiff's presence. *See id.* (citing *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 n.2 (11th Cir. 1982)).

Second, RAM's contention that Collier has failed to demonstrate that Moody's comments were on account of Collier's race borders on the absurd. Apparently, the predicate for this argument is the unarticulated premise that Moody was simply an "unreconstructed bigot," *see Demby v. Preston Trucking Co., Inc.*, 961 F.Supp. 863, 881 (D.Md. 1997), who harbored an antipathy and animus toward members of all racial and ethnic groups outside of his own, and that therefore, the fortuity that Collier, *the sole African-American employee in*

---

[5]Although Spriggs involved supervisory harassment, the first three elements of a *prima facie* case for co-worker harassment, on the one hand, and supervisory harassment, on the other hand, are identical. *See, e.g., Mikels*, 183 F.3d at 329. Only the fourth element, i.e., the bases for imposing liability upon the employer, varies. *Id.*

*the workplace,* found his constant use of racial epithets offensive, should not give rise to liability as to RAM.[6] I reject this notion out of hand. When Moody chose to vilify African-Americans, he intentionally injected Collier's race into his comments and thereby made humiliation and debasement on the basis of her race and ethnicity a part of her experience in the everyday workplace environment. A reasonable juror could readily conclude that Moody's comments, steeped in hateful racial overtones, were motivated, at least in part, because of Collier's race. *Cf. Spriggs,* 242 F.3d at 185 n.6 (quoting *Bailey v. Binyon,* 583 F.Supp. 923, 927 (N.D.Ill.1984) ("The use of the word 'nigger' automatically separates the person addressed from every non-black person; this is discrimination per se.")).

Third, Collier has also presented sufficient evidence to create a genuine issue of material fact as to whether Moody's conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere. Despite RAM's characterization of Moody's epithets as mere isolated "verbal unpleasantries," Df.'s Mem. in Supp. Mot. for Summ. J. at 29, as I observed in *Brumback v. Callas Contractors, Inc.,* 913 F.Supp. 929, 939 (D.Md. 1995), "repeated use of the ancient epithet 'nigger' is far from trivial as a matter of law." Even more forcefully, the Fourth Circuit has stated: "Far more than a 'mere offensive utterance,' the word 'nigger' is pure anathema to African-

---

[6]RAM also alludes to evidence that, at times, Collier and Moody behaved in a civil, and indeed, joking, manner toward each other, that Moody may have repaired Collier's vehicle, and that they even exchanged ribald word-play. This evidence may be considered by the jury for any proper purpose, but it falls far short, even if it could be accepted for purposes of summary judgment, which it is not, as establishing the absence of a racial nexus in Moody's statements.

Americans." *Spriggs,* 242 F.3d at 185; *cf. Rodgers v. Western-Southern Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir. 1993).

Collier has articulated, with specificity, multiple incidents in which this epithet (together with other derogatory terms for African-Americans) was used repeatedly, and even more distressing, Collier has also recounted incidents where this epithet was tolerated and condoned by her own supervisor and Moody's supervisor. More generally, Collier claims to have been exposed on a weekly basis to Moody's comments, specifically the use of the epithet "nigger." Further, Collier's claims are buttressed by her co-workers statements. Sigmon testified that Cordell, Graves and Feld witnessed Moody's conduct. Thus, Collier has presented sufficient evidence for a reasonable trier of fact to conclude that Moody's behavior was sufficiently severe or pervasive to cause a person of ordinary sensibilities to perceive that the work atmosphere at the Property was racially hostile and that persons in supervisory positions were aware of Moody's conduct and tolerated it.

Finally, contrary to RAM's contention, Collier has also presented sufficient evidence demonstrating that Moody's conduct was unwelcome. According to Collier's deposition testimony, she notified Cordell on several different occasions about Moody's conduct in the hope that corrective action would be taken. That a generation of African-Americans exists for whom the use of the "ancient epithet," *see Brumback*, 913 F.Supp. at 939, is genuinely hurtful and damaging is a fact to be celebrated in law, not dismissed as inexplicable or inherently incredible.

D

As mentioned above, an employer is liable for an employee's actionable racial harassment of a co-worker if the employer has actual or constructive knowledge that the harassment is occurring and negligently fails to take prompt and adequate remedial action to stop it. *Mikels*, 183 F.3d at 329 & n.4. ("It is now settled that this failure-to-act-after-notice standard is one for imposing Title VII liability on employers for their direct negligence rather than on *respondeat superior* or other 'imputed' liability principles."). Proper application of the *Mikels* test shows that Collier has carried her burden to generate a dispute of material fact as to whether liability for Moody's creation of a hostile work environment may be imposed upon RAM. Specifically, although there is evidence that RAM eventually addressed Collier's complaints (e.g., Moody was fired), RAM has failed to establish *as a matter of law* that it acted both reasonably and reasonably promptly in responding to Moody's behavior after it acquired knowledge of its occurrence and that Collier was deeply offended by it.

If an employer has a company policy specifically designating the person or persons to whom an employee should report instances of suspected harassment, once the employee complains to the designated person or persons, the employer is deemed to have actual notice of the harassment. *Coates v. Sundor Brands, Inc.*, 163 F.3d 1361, 1364 (11th Cir. 1999). In this case, a reasonable trier of fact could readily conclude that Diane Cordell, the resident manager and Collier's supervisor, had actual authority to receive complaints of harassment

on behalf of the company, that she had actual knowledge of Moody's behavior, and that she failed to take prompt remedial action.

RAM had a clear Anti-Harassment Policy, which stated: "If an employee believes he/she has been harassed, *or* if he/she becomes aware of it happening to someone else, the employee is responsible for <u>immediately</u> reporting that harassment to . . . the employee's immediate manager . . . ."[7] (underline in original)(italics added). It is undisputed that Cordell was the apartment manager of the location at which Collier was employed. Collier has presented sufficient evidence demonstrating factual disputes as to the timing, manner and number of times Collier brought Moody's behavior to Cordell's attention. Therefore, a genuine issue of material fact exists whether Collier adequately put RAM on notice of Moody's conduct.

Moreover, a reasonable person could find that RAM acted unreasonably and without the promptness the law requires in responding to Moody's behavior from the frequency which Collier alleges Moody used racial epithets, coupled with the fact that Collier's co-workers were well aware of Moody's conduct. On this basis as well, therefore, there exists at least a genuine issue of fact as to whether RAM had constructive notice of Moody's behavior and whether, if it did, it acted with the requisite alacrity to respond to that behavior.

---

[7]Harassment is defined to include "repeated slurs, insults, insensitive remarks and jokes, or other personal conduct or mannerisms that could be construed as offensive, derogatory or inappropriate." Thus, the definition of harassment clearly encompassed Moody's acts and statements.

A reasonable person could also draw an inference that the Anti-Harassment Policy was not promulgated with sincerity by RAM given RAM's official response to its investigation of the Collier/Moody incidents. Sigmon testified that neither Feld nor Cordell ever were disciplined for their failure to report or correct Moody's behavior. RAM's policy, however, provides that "managers will be subject to disciplinary action, up to and including termination, if they engage in . . . tolerating unlawful harassment or other inappropriate behavior that is conducted by or engaged by others." RAM's non-enforcement of this mandate is telling.

E

In sum, based on the record here, Collier has established the four elements of her *prima facie* case and RAM has failed to rebut these elements as a matter of law. Therefore, I shall deny the defendant's motion for summary judgment. I also conclude, however, that reasonable minds could choose not to believe all or significant portions of Collier's evidence, or might reasonably decline to draw the inferences she urges. Because genuine issues of fact remain, Collier's motion for summary judgment cannot be granted on the hostile environment claim.

V

RAM also requests that Collier be precluded from seeking any damages because she has failed without justification to respond adequately to RAM's efforts to take discovery on damages. It is indeed apparent that Collier has failed to produce evidence relating to her

alleged damages, e.g., evidence of the costs of medical care. RAM did not file a motion to compel but, under the circumstances, it is not to be faulted for this failure. I shall order that Collier produce--within 15 days of the date of this opinion-- all documentation of any costs and other data associated with her alleged damages, including but not limited to receipts for prescriptions, doctors' bills and hospital bills. Any failure to produce this evidence as ordered will require a further response by this court.

In addition, RAM argues that Collier's claim for front pay be limited to the period she was on disability only through February 29, 2000. RAM argues that Collier's employment with RAM would have terminated on this date, regardless of any alleged racial harassment. RAM contends that it is not liable for any wages Collier lost after this date. Collier, however, has produced some evidence that she was not medically fit to work until June 1, 2000. Therefore, I will deny without prejudice RAM's request to limit Collier's claim for front pay.

VI

Collier also alleges a claim for intentional infliction of emotional distress. In order to prove a cause of action for intentional infliction of emotional distress in Maryland, the plaintiff must demonstrate the following: (1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; (4) the emotional distress must be severe. *Harris v. Jones*, 281 Md. 560, 566, 380 A.2d 611, 614 (1977). Recovery under this theory of liability has been severely limited in Maryland. As explained by the Maryland Court of

Appeals in *Figueiredo-Torres v. Nickel,* 321 Md. 642, 653, 584 A.2d 69, 75 (1991), "'[i]n developing the tort of intentional infliction of emotional distress, whatever the relationship between the parties, recovery will be meted out sparingly, its balm reserved for those wounds that are truly severe and incapable of healing themselves.'" (quoting *Hamilton v. Ford Motor Credit Co.,* 66 Md.App. 46, 61, 502 A.2d 1057, 1065, *cert. denied,* 306 Md. 118, 507 A.2d 631 (1986)).

Collier has failed to produce proof of conduct sufficient to satisfy the requirement of Maryland cases that a plaintiff must prove extreme and outrageous conduct. As I observed in *Brumback*, 913 F.Supp. at 939, racial epithets are no doubt harmful; however, although certainly abhorrent, Moody's conduct and RAM's alleged unresponsiveness to it do not rise to the high level of outrageousness that the Maryland Court of Appeals has required for a cause of action based on intentional infliction of emotional distress. *See, e.g., Figueiredo-Torres v. Nickel,* 321 Md. 642, 584 A.2d 69 (1991) (behavior of psychologist who, while acting as plaintiff's and his wife's marriage counselor, had sexual relations with the plaintiff's wife, was sufficiently outrageous); *B.N. v. K.K.,* 312 Md. 135, 538 A.2d 1175 (1988) (intentional exposure of plaintiff to transmission of herpes was outrageous); *Young v. Hartford Acc. & Indem.,* 303 Md. 182, 492 A.2d 1270 (1985) (insurer's insistence that plaintiff submit to a psychiatric examination calculated to harass the plaintiff and to either force her to abandon her claim or to commit suicide was deemed outrageous); *cf. Farasat v. Paulikas*, 32 F.Supp.2d 244, 248 (D.Md. 1997), *aff'd,* 166 F.3d 1208 (4th Cir. 1998).

Therefore, I shall grant RAM's motion for summary judgment as to Collier's claim for intentional infliction of emotional distress.

VII

Collier also alleges an ostensible state law claim of "employer's breach of implied duty not to imperil the employee." This claim must be dismissed, however, because the claim, whatever its contours, is preempted by the Maryland Workers' Compensation Act. *See Gladhill v. Chevy Chase Bank*, --- A.2d --- (Md.App. 2001), 2001 WL 894267, at *20 (August 1, 2001); *see also Demby v. Preston Trucking Co.,* 961 F.Supp. 873, 881 (D.Md. 1997). Therefore, I shall dismiss Collier's claim for "employer's breach of implied duty of employer not to imperil the employee."

VIII

For the reasons set forth, I shall deny defendant's motion for summary judgment on the Title VII claim, and grant summary judgment on the intentional infliction of emotional distress claim and the "breach of implied duty not to imperil the employee" claim. Collier's motion for summary judgment shall be denied. An Order follows.

Filed: August 21, 2001

ANDRÉ M. DAVIS
United States District Judge